[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 4167
In this highway condemnation case, which has been referred to the undersigned pursuant to General Statutes13a-76 for a reassessment of damages, there are two issues to be determined: (1) the damages resulting from the taking of 2.0 acres of the plaintiff's land; and (2) the validity of a repurchase provision in a deed by which the defendant commissioner, acting in behalf of the state, transferred the same land to the plaintiff in 1963, almost 28 years before the date of condemnation, September 4, 1991. Because the second issue, which the court ultimately resolves in favor of the state, is a novel one, with no clearly determinative precedent, the court has found the facts concerning the damages resulting from the condemnation apart from the repurchase clause in order to avoid the necessity of an additional trial in the event that the clause is held to be invalid on appeal.
 I
The land taken by the defendant consists of three rectangular strips 60 feet in width along the south side of Cottage Grove Road in Bloomfield, Route 218, which are separated by two streets extending southerly from Cottage Grove Road. The three strips are designated as parcels 1, 2 and 3, in the notice of condemnation and are more particularly described in the complaint. In total they comprise 2.0 acres, parcel 1 being 0.64 acres, parcel 2 being 1.01 acres and parcel 3 being 0.35 acres. This land has been acquired by the state in order to widen Cottage Grove Road.
For the purpose of determining the damages resulting from this condemnation, the plaintiff's appraiser, Peter Marsele, has made separate analyses of the effects of the taking on the office building property, which originally included parcel 1, and on the apartment complex, of which parcels 2 and 3 had been part. The court will adopt this format.
A. Office Building Property
The office building property consisted of 5.0 CT Page 4168 acres before the taking, 2.6 acres of which were occupied by a rental office building. Marsele conceded that the taking of parcel 1, comprising 0.64 acres, would have no impact on the value of the building, which he valued at $316,000, both before and after that event. He concluded, however, that the land value had been reduced from $560,000 before the taking to $380,000, resulting in damages of $180,000. This reduction in land value has two components: (1) a reduction in value per square foot from $2.57 to $2.00, and (2) the loss of 0.64 acres or 27,878 square feet constituting parcel 1.
The only basis for Marsele's belief that the unit value of the 4.36 acres remaining after the taking has been reduced by $.57 per square foot is that the reduction in acreage causes the property to become nonconforming, a minimum of 5.0 acres being required by the Bloomfield Zoning Ordinance for office building use in an RB-20 zone. Although the plaintiff owns contiguous land, from which the 0.64 deficit in required zoning area possibly could be cured, the commissioner does not claim that such land, which is presently part of the apartment complex, is available for addition to the office building property. The commissioner in this instance, however, has not attempted to exercise his authority pursuant to General Statutes 48-24 to seek prior to the condemnation, a variance for the office building property. The plaintiff, on the other hand, has not insisted that this property be acquired by the state for its current value, as that statute also provides.
The testimony of the planning director of the town of Bloomfield, Thomas Hooper, indicates that an application for a variance to excuse the acreage nonconformity would probably be successful. He testified that variances had been granted for 6 out of 7 properties under similar circumstances in which the taking of land for widening Cottage Grove Road or Route 218 had resulted in nonconformity of the remaining land of the owners. In these instances, the applicant had been the department of transportation, presumably acting under General Statutes48-24. There is no significant evidence of the reason for the commissioner's failure to apply for a variance with respect to the office building property. CT Page 4169
As Marsele concluded, the violation of the zoning ordinance acreage requirement would have no effect on the value of the existing office building, because "(zoning) regulations shall not prohibit the continuance of any non-conforming use, building or structure. . . ." General Statutes 8-2. Nonconformity, however, would affect the value of the land, because it normally precludes expansion of the existing use and reconstruction after a casualty destroying the building. The Bloomfield Board of Zoning appeals has authority pursuant to General Statutes 8-6 to grant a variance from the acreage requirement in cases of "exceptional difficulty or unusual hardship." Where a nonconformity has resulted from a partial taking of land by eminent domain, a strong case of "exceptional difficulty or unusual hardship" is presented. "Surely there is a clear case of uncommon hardship beyond the control of a property owner when the state seeks to condemn a portion of his or her land and thereby renders it nonconforming to a minimum lot area restriction." Smith v. Zoning Board of Appeals,174 Conn. 323, 328 (1978).
The court has concluded that the probability of a variance to cure the adverse consequences of the nonconformity resulting from the taking of parcel 1 is so great that a prospective purchaser would diminish the price offered for the office building property only by his estimate of the expenses to be incurred in obtaining the variance. These costs would be for legal and engineering services. Although no evidence was presented on these items, the court is sufficiently familiar with the work involved to conclude that a reasonable allowance for those expenses, primarily for the legal services, would be $10,000. It is appropriate that the state should bear these expenses in view of the failure of the commissioner to follow the mandate of General Statutes48-24 by obtaining a variance before condemnation.
 B.
In addition, an allowance must be made for the value of the 0.64 acres comprising parcel 1 that the state has acquired. As indicated previously, Marsele valued all of the office property land before the taking at $2.57 per square foot, which would result in a value CT Page 4170 of $71,646 for the 27,878 square feet constituting parcel 1. The defendant's appraiser, John Manfreda, testified that the unit value of the office building land was $140,000 per acre, equivalent to $3.21 per square foot. This appraisal is somewhat flawed, however, by the failure to adjust the three comparative sales utilized for the decline in market value that occurred after 1988-89, when those sales transpired, to September 4, 1991, the condemnation date. The Marsele appraisal made adjustments ranging from 15 to 20 percent on the three comparative sales he relied upon, which also took place in the 1988-89 period.
The Marsele appraisal, however, made no allowance for the fact that the three comparable sales used ranged from 1.25 to 1.82 acres, while the office building land comprised 5.0 acres. While this difference in size is not so great as to make the wholesale-retail analogy fully applicable, some allowance for this factor is appropriate. Manfreda discounted his three comparable sales by 10 percent in making such an allowance.
In arriving at his unit value of $2.57 per square foot, Marsele selected the highest unit value indicated by any of the three sales utilized, sale #3, rather than $1.99 or $2.41 per square foot indicated by sales #1 and #2. Sale #3 was the smallest in area of the three sales and was less recent than sale #2, with an indicated value of $2.41 per square foot. The average of the three unit prices is $2.32 per square foot. An appropriate adjustment of 5 per cent, reducing the average unit price to $2.20 per square foot should be made because of the difference in size between the subject property and the land involved in each of the comparable sales used by Marsele.
 C.
The court concludes that the damages resulting from the taking of the 0.64 acres constituting parcel 2 are as follows:
 Severance damages resulting from zoning conformity . . . . . . . . $10,000 CT Page 4171
 Value of land acquired by state: 27,878 square feet at $2.20 per square foot $61,332 ------- $71,332
II. Apartment Complex
Parcels 2 and 3 comprise the front 60 feet of an apartment complex containing 13 apartment buildings and a total of 157 rental units, which produced a gross annual rental income of $1,429,140. (Ex. E, p. 15). After allowing for various expenses, Marsele determined that the net income before depreciation was $787,349, of which he allocated $226,361 to the land and $560,988 to the buildings. Applying a capitalization rate of 11.1 percent to the net income allocated to the buildings, he calculated their value before the condemnation to be $5,054,000. (Ex. B, pp. 10-16). He appraised the apartment complex land of 1,052,845 square feet (24.17 acres) at $2.50 per square foot, resulting in a value of $2,632,100. For the land and buildings together, his valuation was $7,686,100 before the taking. (Ex. B, pp. 9, 17).
As a result of the taking of parcels 2 and 3, Marsele concluded that the value of the remaining land was $1,927,200 and that the value of the buildings had been reduced to $4,530,000. He found a total reduction of $1,228,000 in the value of the apartment complex as the damages caused by the taking. (Ex. B, pp. 22, 24). The basis for these conclusions is that Parcels 1 and 2 had been planted with pine trees when the apartments were constructed about 25 years ago and these formed a natural privacy screen, concealing the apartments from the view of passing motorists on Cottage Grove Road and reducing the noise from traffic. He believed that the increase in vandalism that had occurred in the complex after the trees had been removed was attributable to the visibility of automobiles of the tenants parked in the open carports, which are now visible from Cottage Grove Road. As a result of the loss of privacy, increased noise and more frequent car theft and vandalism, he concluded that the value of the remaining land had been reduced from $2.50 to $2.00 per square foot. He also concluded that CT Page 4172 these adverse consequences would result in increasing the apartment vacancy rate from 1 percent to 10 percent and would reduce gross annual rental income by $58,161. (Ex. 8, pp. 20, 22).
Marsele's belief that a decrease in rental income, resulting from an increased vacancy rate of 10 percent or from rental rates below the market for similar apartments, would result from the loss of the pine tree screen along Cottage Grove Road is not adequately supported by the evidence. The claim that an increased crime rate has resulted from the removal of the trees is refuted by the testimony of Officer Richard Mulhall, who testified that there had been a substantial increase in auto theft, larceny, and vandalism during 1992, particularly in the summer, but that it was not confined to the plaintiff's apartment complex and concerned several other apartment complexes in the central or southern part of Bloomfield as well. He opined that the enhanced visibility of the apartments from the road increased the opportunity for police surveillance of the property, which they regularly patrolled. The court is not persuaded that the crime increase at the apartments in 1992 can reasonably be attributed to the removal of the trees.
There is also no substantial evidence of any actual increase in vacancies as a result of the loss of the pine trees. The only specific evidence as to the number of vacant apartments is contained in a response of the plaintiff to interrogatory No. 8 of the defendant (Ex. 15), which indicates the number of vacancies from March 4 to September 4, 1992. Over this period, vacancies declined from 8 to 2. There is no testimony that any of the tenants left the property because the trees had been cut. There is evidence (Ex. 14) that the plaintiff raised its rental charges by amounts ranging from $20 to $40 per month in January 1991. It cannot be disputed that the greater Hartford economy has been in a decline since 1988. The evidence simply does not justify an inference that vacancies in the apartments have increased as a result of the removal of the pine tree screen rather than because of other factors.
Nevertheless, it is apparent from a view of the CT Page 4173 property that the taking of the sixty foot strip that contained the trees will detract from the attractiveness of the apartments until the new plantings that have been made or will be made grow sufficiently to provide comparable privacy. The decrease of sixty feet in the distance of the apartments from Cottage Grove Road is also bound to increase the level of noise generated by passing traffic. These effects will impact significantly only the front apartments in buildings 1, 6, 7, 8 and 9. No such impact is likely upon the remaining buildings or apartments.
William Bonaminio, a landscaping expert employed by the state department of transportation, testified from his observations before the trees were removed that the pine trees had outlived their usefulness as a screen because the lower branches had been removed as the trees had matured, exposing the apartments to public view from Cottage Grove Road. He proposed a landscape design (Ex. 11) for plantings in the remaining space between the highway taking line and the apartments with additional plantings in the strip between the taking line and the paved portion of the highway. He estimated the cost of this plan as $18,819. (Ex. 12). The owner had already installed plantings along the front of the apartments, the cost of which Bonaminio estimated as $44,375. (Ex. 13).
The new plants and others that may be installed in the future will go far toward restoring the attractiveness of the apartment complex, when they mature in about ten years. They will also provide a privacy screen and reduce the highway noise level to some extent. Nevertheless, the effect of moving the highway 60 feet closer to the apartments cannot be entirely overcome. The front apartments inevitably have become less desirable than they were because of the closer proximity of the highway and, until the new plantings mature in about 10 years, the diminution of privacy. Some adjustment of the rent for those apartments below what otherwise would have been charged is probable.
In making an allowance for the diminished rental value of the front apartments, the court concludes that the harmful effects of the taking would be confined to CT Page 4174 those apartments within the most northerly one third of buildings 6, 7 8 and 9, whose original distance from the highway has been reduced from about 100 feet to about 40 feet. (Ex. A1, A2). There would be a lesser impact on building 1 with respect to highway noise because it is situated about 125 feet from the old highway line and 65 feet from the new highway line. (Ex. A2). The intensity of noise diminishes in proportion to the cube of the distance from the source. Two thirds of building 1, however, fronts on Cottage Grove Road. Accordingly, the court concludes that the rental value of the front one third of buildings 6, 7, 8 and 9 has been reduced by 5 per cent as a result of the taking and that of the front two thirds of building 1 by 2.5 percent.
The resulting damages may be computed as follows from Exhibit B:
Annual Rental Income Apts. 6A — 6L: $97,800 Annual Rental Income Apts. 7A — 7L: $96,120 Annual Rental Income Apts. 8A — 8L: $105,780 Annual Rental Income Apts. 9A — 9L: $106,080 -------- $405,780
Annual Rental Income Bldgs 6 — 9: $405,780 Affected Appts. (1/3 X 405,780): $135,260 Projected Rent Reduction (5%): $6,763
Annual Rental Income Bldg 1: $96,720 Affected Apts. (1/3 X 96,720): $32,240 Projected Rent Reduction (2.5%): $806 Total Rent Reduction Bldgs. 1, 6 — 9 $7,569 $7,569 capitalized at 11.1% = $68,189
In addition to the probable loss of rental income, the plaintiff is also entitled to recover the reasonable cost of the plantings it has installed to screen the front of the apartment complex from Cottage Grove Road. The plaintiff offered no evidence of the cost of this work, but Bonaminio's estimate of $44,375 is reasonable.
The plaintiff is also entitled to compensation for the fair market value of parcels 2 and 3, comprising 59,241 square feet (1.36 acres). Marsele valued the CT Page 4175 apartment land at $2.50 per square foot upon the basis of three sales, one in the industrial zone and the other two in the P.O. zone, which permits office buildings. The apartment land is in an R-15 zone. No adjustment has been made for differences in the uses permitted in the three different zones.
The state's appraiser, Manfreda, estimated the apartment land to have a value of $80,000 per acre, or $1.84 per square foot. He based this estimate on three sales of residentially zoned land, one of which had been approved for apartment use. These sales were not as close to the subject premises as those relied upon by Marsele. After weighing all these factors, the court concludes that the apartment land had a value of $2.00 per square foot before the taking. Accordingly, the plaintiff is entitled to recover for the $59,241 square feet taken by the state the sum of $118,482.
A recapitulation of the damages to the apartment complex is as follows:
Damages from reduction in rental value of front apartments, buildings 1, 6 — 9: $75,450 Reasonable cost of new plantings: $44,375 Loss of 1.36 acres, parcels 2 and 3: $118,482 -------- $238,307
C. Summary of damages
A summary of the damages found is as follows:
 Office Building Property $71,332 Apartment Property $238,307 -------- $309,639
 II
The remaining issue is whether the amount of damages found for the taking should be reduced because parcels 1, 2 and 3 are part of the 60 foot strip of land that was conveyed to the plaintiff by the state in 1963 subject to the following provision: CT Page 4176
 As part consideration for this deed, the Releasees herein hereby agree for themselves, their heirs and assigns, that the State of Connecticut or the Town of Bloomfield of said State of Connecticut shall have the right to purchase said premises, with all improvements thereon, together with access thereto from the adjacent land of the Releases herein in said Town of Bloomfield, for the sum of $16,060.00 in the event said premises shall be required by either said State of Connecticut or said Town of Bloomfield for highway purposes, upon giving the owner of record sixty (60) days notice in writing to that effect.
It appears that the state had originally acquired this 60 foot strip in conjunction with its plan to build a highway bypassing the city of Hartford and connecting I-91 and I-84 south and west of Hartford with the continuation of I-91 north of Hartford. When that plan was abandoned, the 60 foot strip became available for purchase by the plaintiff's predecessors in title, Henry and Louis Beckenstein, who, at the time of the conveyance, owned the land adjoining the southerly boundary of the strip. On the basis of the repurchase provision of the deed, the state filed an assessment of damages of $16,060 with the court on the date of condemnation as its estimate of "just compensation" for the taking. General Statutes 48-11.
On January 16, 1991, the state notified the plaintiff of its intention to exercise its right to repurchase the property pursuant to the condition in the 1963 deed. After some further communications in June, 1991, were unproductive, the state on September 4, 1991 filed a notice of condemnation declaring that the 2.0 acres taken were necessary for widening Route 218. After the plaintiff had appealed, the state raised the repurchase clause as a special defense. The plaintiff has filed a reply to this defense claiming that the deed provision is void because it violates the rule against CT Page 4177 perpetuities and also constitutes an unreasonable restraint against alienation. In its brief, the plaintiff also claims that by proceeding with the condemnation rather than bringing an action for specific performance to enforce the deed provision, the state has waived its benefit. In any event, the plaintiff claims, it would be entitled to recover severance damages because the deed provision would merely control the price of the land taken and not defeat its claim for severance damages.
A. Rule against perpetuities — restraint on alienation
The plaintiff contends that the repurchase clause in the deed is invalid because it constitutes an option contract, giving the state a right to repurchase the 60 foot strip for $16,060 "in the event said premises shall be required by either said State of Connecticut or said Town of Bloomfield for highway purposes." It claims that such an option, being unlimited as to time for its exercise, violates the rule against perpetuities and, also because of its unlimited duration, is an unreasonable restraint on alienation. Both these claims are referred to herein as perpetuities claims, since their basis is the unlimited duration of a fixed price option. The plaintiff's position is supported by several cases holding that "a continuing option of purchase unlimited in point of time is void ab initio," Lewis Oyater Co. v. West, 93 Conn. 518, 530 (1919); Neustadt v. Pearce, 145 Conn. 403, 405-06 (1958). This view is consistent with most of the cases in this country that have considered the question. Annot. 66 ALR 3d 1294, 1296-97; 61 Am.Jur.2d 61. The Restatement takes the same position with respect to the applicability of the rule against perpetuities to options, including repurchase options reserved by the conveyor. Restatement, Property 2d 393, 394. The English courts also apply the rule to options, but have created an exception for enforcement of an option between the original parties. 6 Am. Law of Property 24.56. In this state it has been held explicitly that a repurchase option must comply with the rule against perpetuities. Neustadt v. Pearce, supra.
The defendant maintains that the repurchase CT Page 4178 provision created, not an option, but a reverter in the grantor that would become operative upon the fulfillment of the condition that "said premises shall be required by either the State of Connecticut or said Town of Bloomfield for highway purposes." The Connecticut decisions thus far have adopted the view that a reverter to the grantor upon the occurrence of a condition in the deed terminating the estate of the grantee is exempt from the rule against perpetuities. City National Bank v. Bridgeport, 109 Conn. 529, 540-41 (1929); Warner v. Bennett, 31 Conn. 468, 475 (1863). "The possibility of reverter, being a vested interest in real property, is capable at all times of being released to the person holding the estate on conditions or his grantee, and, if so released vests an absolute and indefeasible title thereto." City National Bank v. Bridgeport, supra, 541 (quoting Brattle Square Church v. Grant, 69 Mass. 142, 148
(1855). This analysis is in accord with the so-called "American doctrine," followed by the courts of this country, holding that a right of reverter on condition is a vested interest in the grantor and, therefore, is not within the rule against perpetuities, despite the remoteness of the contingency triggering the right of reverter. Annot. 70 ALR 1196, 1197, 61 Am.Jur.2d 47. Limitations over, or executory interests to take effect upon the occurrence of a condition subsequent, are subject to the rule. Annot. 45 ALR 2d 1154, 1155.
The exemption of reverters from the rule has been harshly criticized by some commentators as unjustifiable and they urge adoption of the contrary English doctrine. 6 American Law of Property 24.62. The Restatement of Property (1944) accepts the exemption as a "product of history." Restatement, Property (1944) 372. It declares explicitly, however, that an option to repurchase reserved in favor of the conveyor is subject to the rule. Id. 394. "An option to repurchase . . . causes the same inconvenience in connection with the alienability of the subject matter of the conveyance as an interest so limited in favor of one other than the conveyor that it may continue . . . for longer than the maximum period. . . ." Id. 394 Comment a. "Because an option tends to reduce the incentive of the owner of land to improve it so long as the option exists, courts have subjected the option to the Rule against CT Page 4179 Perpetuities." J. Dukeminier, "A Modern Guide to Perpetuities," 74 Cal. L. Rev. 1867, 1908. The Restatement also would also resolve any ambiguities in an instrument that arguably creates a reverter in favor of construing it as an option in order to subject it to the rule against perpetuities. Restatement, Property (1944) 394, Comment c.
The classic statement of the rule against perpetuities is that "[n]o interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." Gray, [The Rule Against] Perpetuities (3d id.) 201. If the rule prohibits simply the remoteness of vesting of future interests, as it is generally viewed; 61 Am.Jur.2d, Perpetuities 7, 44, 6 American Law of property 24.3 its application to this agreement would be difficult to justify in light of the well-established exemption for reverter or rights of reentry upon occurrence of the condition terminating the estate of the grantee. City National Bank v. Bridgeport, supra, 541. One of the arguments against this exemption, the problem of identifying and locating the holders of the reversionary interest after the passage of many years; American Law of Property 24.62; would not apply when the state holds such an interest, because its permanence must be presumed. Nevertheless, the existence of an option would tend to discourage the development of property because of the likelihood of its exercise whenever the market value of the property exceeds its option price.
It appears that the weight of authority would construe the repurchase provision in this case as an invalid option contract that fetters the alienability and development of the property conveyed for a greater period than permitted by the rule against perpetuities. The functional equivalence of this provision to a reverter clause terminating the estate of the grantee upon occurrence of the condition that the grantor should require the property for highway purposes and pay the stated price, to which the rule would not apply under the "American doctrine," would not save it, according to the authorities. The significant issue presented in this case, however, is whether the rule, which was created CT Page 4180 many centuries ago by judges to prevent the English gentry from restricting the alienability of land by keeping their estates perpetually within their families, is applicable to the state when it attempts to establish the price of a probable future land acquisition for highway purposes.
The commissioner has cited two cases involving stipulations that set the price of land or interests therein that the state might acquire in the future for public purposes. In Mongillo v. Commissioner, 214 Conn. 225
(1990), the agreement provided that the state had a right to condemn additional land from the property owner at a specific price per acre if it became necessary to take the land due to a change in the design of the highway, which agreement was to terminate on completion of the highway. Since the rule against perpetuities eschews probabilities and requires absolute certainty that a future interest will vest within twenty-one years, when no measuring lives are referred to in the instrument, it appears that this provision would have violated the rule, since it was possible when the agreement was made that the highway would not be completed within the time allowed by the rule. The perpetuities issue was not raised, however, and the court had no occasion to discuss the subject.
In the second case cited by the commissioner, Bradley Facilities, Inc. v. Burns, 209 Conn. 480 (1988), a condemnation clause in a lease by the state of an airport facility providing for an award to the lessee, in the event of a condemnation during the lease term, based upon the lessee's original investment in the facility and not upon the fair market value of the leasehold, was upheld against a constitutional claim of impairment of contract. No perpetuities claim was raised in this case despite the provision for two five year renewal options following the original term of twenty years. Options in long term commercial leases, however, were in this state later exempted from the rule against perpetuities. Texaco Refining of Marketing v. Samowitz, 213 Conn. 676,685 (1990). We may glean from these two cases relied on by the state, nevertheless, the principle that the public policy against fettering property with restraints that discourage its improvement and impair its alienability at CT Page 4181 a price reflecting its current value is not inexorable when the restrictions involved advance other public objectives.
The court is not aware of any cases in which the rule against perpetuities has been applied to invalidate a future interest acquired by a state in the performance of a governmental function and held for such a purpose. Not every rule of property law is applicable to a state. "Title to realty held in fee by a state . . . for a public use cannot be acquired by adverse possession." Goldman v. Quadrato, 142 Conn. 398, 402-03 (1955). A rule, designed to restrain the aggrandizement of family dynasties during the middle ages by limiting the time during which the alienability of land could be curtailed, ought not to be applied to a governmental body without first concluding that the policy of the rule in promoting the unrestricted alienability of land will otherwise be seriously frustrated. The circumstances of this case do not indicate any such impact.
When plans for the highway for which it originally had acquired the 60 foot strip were abandoned, the state faced two alternatives: (1) retaining the strip for a purpose that might never materialize, despite its foreseeability; or (2) selling the strip to adjoining landowners, who planned to use it immediately to beautify and enhance the value of their apartment complex. Under the first of these choices, the state would have held a piece of land for which it had no use during the past thirty years because of the expectation that eventually the land would be needed to widen Cottage Grove Road. Its choice of the second alternative has made it possible during this period for the purchaser to increase the value of their apartment complex by planting trees in the strip to reduce highway noise and increase the privacy of the tenants and has also generated greater tax revenue for the town of Bloomfield because of the transfer to private ownership. The state has enjoyed the benefit of the purchase price for the past thirty years and the plaintiff for the same period has had the benefit of the land and the increased rental value of its apartments.
The state, of course, could have sold the strip without the repurchase provision. That course of action CT Page 4182 would have been detrimental to the state's interest, however, because it was forseeable that Cottage Grove Road would have to be widened eventually and such a provision would conserve the state's financial resources in view of the increasing price of land. The purchasers were aware of the likelihood that this strip of land would be taken from them eventually. All of the buildings on their adjoining land were set back about 100 feet from Cottage Grove Road before the taking of the 60 foot strip, which has reduced the set-back distance to about 40 feet. The repurchase provision may have discouraged a more intensive use of the land by the purchasers, but their realization of the eventual need for widening Cottage Grove Road would probably have produced a similar result.
The court concludes that the rule against perpetuities ought not to be applied to invalidate a repurchase provision inserted in a conveyance by the state for the purpose of conserving the public exchequer in view of the likelihood that the land transferred will eventually be needed for a governmental purpose, such as widening a highway. Accordingly, the challenged provision is enforceable and limits the damages for the taking of this property to $16,060, the amount of the commissioner's assessment pursuant to General Statutes13a-73(b).
 B.
The remaining claims of the plaintiff are that the commissioner waived the benefit of the repurchase provision by instituting a condemnation proceeding rather than an action for specific performance and that it is entitled to severance damages even if the repurchase provision is valid with respect to the value of the land taken by the state. Neither of these claims has merit.
In Colaluca v. Ives, 150 Conn. 521, (1963), in which the state sought specific performance of an option to purchase real estate, it also instituted a condemnation proceeding for the purpose of acquiring the same land. Both the condemnation appeal and the option contract action were tried together. During the trial the state purported to withdraw the condemnation CT Page 4183 certificate with the trial court's permission and the trial court rendered judgment for the state in both cases. On appeal the Supreme Court held that, regardless of whether the condemnation certificate could be withdrawn, the owner was entitled only to an award of just damages and that the option contract limited such damages to the price set forth therein. Similarly in this case, the repurchase provision limits the condemnation damages to the $16,060 stated therein, "since that was the full value of [the plaintiff's] interest in the property at the time of the claimed taking." Id., 531. The state never abandoned its rights under the repurchase agreement but sought to enforce them without litigation. It lost no rights by electing to proceed by the more expeditious procedure of a condemnation rather than a more protracted action for specific performance.
The claim of the plaintiff that it is entitled to severance damages resulting to the remainder of its land from the taking of the 60 foot strip also lacks merit. If the repurchase provision is valid, as the court has concluded, the state cannot be penalized for enforcing its rights thereunder. The plaintiff's predecessors in title were bound by their agreement to convey the strip for $16,060 if it should be needed for widening the highway and the plaintiff is entitled to no more than that sum despite the fact that the increment of value to the entire apartment complex that was added by the purchase of the strip thirty years ago has now vanished. This consequence must certainly have been contemplated at the time the strip was purchased subject to the repurchase clause.
It is ordered that judgment enter for the defendant.
David M. Shea State Trial Referee CT Page 4184